We have three cases this morning, and the first one is Tiger v. Precision Drilling Corp. Appellate No. 22-1613. May it please the Court. My name is Justin Swidler, and I represent approximately 1,000 individuals who work for precision drilling as oil and gas workers. We're here today before this Court on the second time. Previously, the Court determined that it was undisputed that the plaintiffs in this case were required to wear PPE to protect themselves from hazards of the job site, which included falling objects, hazardous materials, electrical shock, and similar risks. So that was primarily an evidence decision in the end as to what type of evidence, lay evidence, could come in? I'm sorry, Justin, I'm having a little trouble hearing you. I greatly apologize. And was the decision primarily relating to the type of evidence that can come in? Well, yes, Your Honor. The previous Court had granted summary judgment determining that we needed expert evidence because the Court was concerned about whether we could prove a causal link between the PPE and the hazards of the job site and the harms of the plaintiffs who were facing. This Court found that no causal link is required under the Appellate Act. But the test that we do have to apply is integral and indispensable. And I'm going to ask all of you the same question. What is the test for integral? What is the test for indispensable? And does the record here support each of those conjunctive requirements? Yeah, absolutely. As the Court is understanding, under BUS, the test is integral and indispensable. And that has two requirements, neither of which the Court's transcend ordinary risk test took into account. The first is whether the work is tied to the productive work. The work is tied to the productive work? I'm sorry, whether the activity in question is tied to the productive work. And so, for example, if the activity in question is more about an ingress, egress activity, such as perhaps checking in at a time clock, that's not going to necessarily be, or if it's a security scan, as we know, when you're leaving the work site in Amazon, you could still do your job at the warehouse without doing those activities. So it has to be directly tied to the primary work the employee is employed to do. And the other requirement is that the employee cannot do that work if they were to negate doing the activity in question. And we can meet both requirements. So what do you tell us indispensable means? You want to try that again? Absolutely. Indispensable means that it is an activity which the employee, if the employee does not perform, he cannot perform his primary work in which he's hired to do. So integral, again, would mean that it's tied to the productive work. It's part of the work that he's hired. And indispensable means it's a required component of that work intrinsically. So a waiter or waitress has a uniform, okay? Doesn't that appear to satisfy your test? I don't believe so, Your Honor. Why not? Because an employee could safely and effectively be a waiter without putting on his uniform. I mean, I suppose if the uniform had certain tools on it. All right. Police officer. Well, it's an interesting question. I mean, a police officer's uniform does identify him or her to the public. Usually these cases, because of 2030, usually police officers are unionized. They don't necessarily get before the court. Right. Private security guard. Uniformed. Well, I think these are closer calls than we have in our case. And I don't think the court has. No, they're closer calls. That's why I'm asking about that. Right. Well, perhaps they're better questions for the Department of Labor. I mean, this is what I would say. A police officer in particular, his uniform does have an identifying role to the public. Usually it also includes tools that perhaps are beyond the question you're asking. But usually when they're putting on their uniform, they're putting on a radio. They may be putting on firearms. And so those types of tools would be part of the job. What we have here are not uniforms, though. I mean, they are protective equipment, which the defendants own materials, management, OSHA. It is undisputed. It provides protection to these employees for risks that they face on the job site. The risks that they face on the job site, even the district court found, can be lethal. We had an example during the class period where a rig worker's hard hat was impaled with a pin that had fallen 83 feet above his head. Is that safety or danger? Is that a condition precedent to even being compensated? For PPE? I would think so, because it gets to the indispensable part of it. If there's no danger, then it potentially is not indispensable. And, you know, there may be a fact pattern that I'm not coming up with where that wouldn't be the case. But certainly in our case, the danger is an important element. It's why it's indispensable. But you answered Judge Schwartz's question, and she has the same question I do. Let's talk about what integral means, what indispensable means. I'm not sure what the difference is between your two prongs. Tied to the protective work, an employee can't do the work without it. It seems like all of that gets swallowed up by indispensable. Are you really giving integral any independent meaning here? Well, under BUSC, I mean, the court says what integral and indispensable means, and I believe I have fairly paraphrased it from the Supreme Court. Right, but the problem is it's very general, and we might like to give some more guidance here. So how should we understand all BUSC that is integral means intrinsic, and, you know, you tied to the productive work. But is there anything more to say about it? Well, I think so. I mean, as we, you know, if we take a look at the cases the Supreme Court has previously decided on similar activities, we know from Steiner that where workers who go into a battery plant who could, in a sense, they could do the job without changing into those work clothes out, but it would be dangerous to their health. That's integral and indispensable. And the court said it couldn't think of a more sort of a more easily definable way that that activity would be compensable. We also know under Mitchell that sharpening knives for butchers, even though they could clearly cut meat without a sharpened knife, we know that that's integral and indispensable. And in our case, the idea, you know, Precision has said before, well, you know, you could, in a metaphysical sense. Let's stick with the knives issue. Sure. The dull knives. What makes it integral? What makes it indispensable? Well, the activity is required to be performed in the Mitchell case so that the workers can effectively do their primary work, which was meat cutting. If their knife is duller, they're more likely to, the facts of the case where they're more prone to injury because you're more likely to cut your finger. The meat that they're preparing may not be as well cut out. And so in that case, it's integral and indispensable because it's a tool of the job. It provides protection, and it provides protection while the employee is doing the primary work their employee can do. It's directly tied to that productive work. I mean, an example where we know it doesn't hold is a security scan at the end of the day. So Amazon did require the employees to go through a scan to make sure they weren't stealing items. So in a sense, that may have been a required activity, but it wasn't integral because it wasn't tied. You know, you clearly could effectively and safely perform your job in a warehouse without going through the security scan. And another similar example – oh, those of you who have a question. What about COVID masks? Well, I mean, I think that the risks that we understand from COVID has evolved over time, and so I don't know if my answer to – Let's say we're in the middle of the peak surge of Omicron. Sure. Well, I would think that if you work in a crowded – if you're working in a crowded workspace in the peak surge of Omicron, I would think putting on the mask is, you know, is integral and indispensable. You can't do your productive work without it. However – You can't do your productive work without it because it's possible you'll get sick, someone else may get sick, and therefore the employer's efficiency would be reduced. It would be very reduced. It would clearly change all sorts of problems with production. But most importantly is, you know, during the performance of that productive work – I mean, if we're thinking in a crowded – I mean, the problem is that kind of proves too much. If you show up to work naked, it's going to distract a lot of people at work, right? Not as much work is going to go on in that workplace. And yet you are not taking the position that the time that the employee needs to put clothing on is integral and indispensable, like ordinary street clothing. Well, no, of course not, because I don't think the reason you have to be dressed is tied to the productive work. And I understand your point. You can take any example and just go crazy with it. But the reason – and this is why when I ask, if you're in a very crowded situation in the peak of Omicron, that feels different than a normal workplace because the risk is clearly significantly higher in a crowded workplace. If you're, you know, if you're around – if you're in a crowded warehouse where you're in very close encountering with people, where you're within the six feet. The problem with this argument is everything is going to become a jury question. No one's ever going to get summary judgment. And we would like to give employers some kind of idea of what they need to compensate for and what they don't. Well, I would think that the biggest problem with Precision's argument is they don't draw the line anywhere. Nor does the district judge. I mean, he talks about the risks of falling being too sporadic, seemingly misunderstanding the idea that a risk is always present, the incident doesn't occur every time. Why is it not sporadic enough? Or he talks about the hazardous materials and the falling risk not being hazardous enough. So even though they're lethal, maybe they're – he thinks they're not quite hazardous enough. Or the fire risk isn't quite sufficient enough. He doesn't explain what that would be. I think his test is very difficult. We would encourage for the other one where someone got killed and, therefore, it wasn't indispensable since it hadn't protected them. So it's either not lethal enough or too lethal. Right. And that's – we believe that that's, you know, falls into the all or nothing fallacy. And, you know, it's equivalent to saying airbags don't protect individuals because people have died in car accidents since they've been created. The person who died died of a blunt force trauma to the head during an operation that is common at Precision when a part came loose and he got hit with basically shrapnel in the head. So – and the other – the 83-foot pin that fell on the individual's head, luckily he survived. He did have a permanent brain injury. These are dangerous jobs, and I don't think Precision is going to get up here and tell you otherwise. Counsel, you are over time, but what we're going to do is I think the panel may have questions for you, so we're going to ask you to kind of focus on our questions and allow you to go over time to answer those questions. I understand, Judge Schwartz. Thank you. So, Judge Bevis, do you have any follow-ups? No, not for you. Judge Inouye. Let me ask you about the change at home rule, if I could. Yes. As I understand the record, there is no requirement that the donning and doffing happen on the rig. Is that correct? That's – we don't agree with that. Is there something – can you identify where in the record there is a rule that required folks to change on the rig, or is there at least a disputed fact? Right. Because we have lots of folks who testified they changed on the rig. Others did not. There's an affidavit from at least one person who said that was not required. Right. Well, it's undisputed – most of the individuals actually live on site. They live on the work camps because these are remote drilling operations, and there are explicit written rules that we provide that specifically state you cannot bring soil PPE into the work camps. But we do know from the testimony that some of the employees did do so, correct? No, not from the work camps. There is some testimony from management that very unusually, but perhaps some people did sometimes bring into the coveralls. Your representation is not one employee testified that they brought their clothing off the site and washed it off site. No, I'm not saying that no one – I'm saying that there's a difference between what employees did and what the work rules were. It is written in their handbook in the policy that you're not to bring dirty PPE into the work site. It's also the case that it is unlawful under federal law to bring the greases and the chemicals that get on the PPE. They cannot be placed into municipal water supplies. If you are hooked up to your municipal water supply and you launder those PPE at home, it would be illegal. That is also undisputed. Are you saying there's no dispute that there was a rule that you needed to change on the work site? Well, I would say there's no dispute they ever communicated a rule that you were allowed to bring your PPE home. But I think what you're asking is, can I point to a rule that specifically says you cannot bring your PPE home? And the closest we have is in our reply brief, and it's on pages 23 to 25, where we quote from the handbook. For example, one, and it's a snapshot, clean off all greases, lubricants, and chemical residue before eating, drinking, smoking, and or going home. And it's been found undisputed that these greases regularly get on the PPE. But that rule doesn't say you have to don and doff on the work site. That's true. It says what I've said. I mean, if the court is driving a distinction, then I'm giving the evidence that we have. And what does that mean? There's an issue of fact concern. I don't get home rule plays a has a role in whether or not this is compensable. I don't believe I mean, the designee for the company, who is also the vice president of safety, said it would be against common sense to bring PPE into a residence and to bring it home. I don't believe, based on the facts of this case, a reasonable juror could come back and say there was a take home policy at precision. But I do recognize if your question is the only way we could win summary judgment is if I can point to a handbook that says you cannot ever bring PPE home. I don't have that. All right. We'll have you back. You did not reserve time for rebuttal. I meant to, Your Honor. And I did tell. But he told me I was supposed to tell the court. So if I've lost my ability, I don't know. We since you advised our court crier, that is the man who keeps the clock. Thank you so much. Two minutes, Your Honor. All right. We'll see you back on rebuttal. And we'll hear from the Department of Labor. Thank you so much. And we thank the department for accepting our invitation. Join us today. Good morning. Erin Millian on behalf of the United States Department of Labor. May it please the court. I'll start with the question that Judge Schwartz asked in the very beginning of my colleague's argument, which is what is the correct test here? The test for whether pre-shift activity is compensable is whether that activity is integral and indispensable to the proper, that is, the safe and effective performance of the work. The standard does not require hazards in the workplace that transcend ordinary risk in the sense that the hazards have to be lethal or very serious or extremely likely, much less occurring with great frequency in that particular workplace. But the Second Circuit, counsel, the Second Circuit did impose the test you say that there's no law for. Correct? In their transcendent risk test. No, Your Honor. The Second Circuit correctly determined in Perez that the activities before it, the donning of the uniforms, the donning of the protective gear, that these activities fell on the integral and indispensable side of the line. The problem comes with this phrase the court used. This phrase transcends ordinary risk. But the Second Circuit never defined that phrase, neither in Perez or Gorman. And in fact, in Gorman, they only used the phrase to describe the facts of a different case. And that particular concept was not necessary to the Second Circuit's decision in Perez because the Second Circuit in Perez never had that occasion to determine whether protection against some hazard less severe than a gunshot wound. But in Gorman, counseling Gorman in the nuclear plant case, that's what the court did, didn't it? It's a little unclear what's going on in Gorman. The court did use the phrase transcends ordinary risk, but again, the court was using that phrase to describe the facts of stank. And then later the court said, well, that the activities in question were no different than what would happen under normal conditions. That's a concept from the Secretary's regulation. But actually in Gorman, the court never specifically equates transcending ordinary risk and normal conditions. And in fact, in the Secretary's regulation, normal conditions might describe a situation where there's no risk at all. Now, it's true, of course, that the court in Gorman did determine that the PPE at issue there, which is not that different than the PPE at issue here, was not integral and indispensable. But that case has to be limited essentially to its facts for a couple of reasons, and limited in its essential value for a couple of reasons. First, the key to this test, and this is what the court said in Busk, and this is where you have to start, is what are the principal activities that the employee has been employed to perform? And in Gorman, that was not even before the court, because the plaintiff didn't even plead what the principal activities are. So although Gorman said, well, this was occurring in normal conditions, we can't really take much from Gorman about how you would go about analyzing that case. And secondly, to the extent that Gorman seemed to be concerned with the generic nature of the gear, the press court has made very clear that's not, the Second Circuit doesn't have a categorical test, a categorical line about generic gear. And of course, they couldn't, because as this court has already said, this analysis is inherently flexible, it's fact-specific, and you have to look at the totality of the circumstances of the case. If you could please go back and just tell us what you mean by the word integral as distinct from indispensable, which I think Judge Bevis was asking your colleague about. Yes, Your Honor. So integral, the Supreme Court laid out the definitions of these terms, as my colleague said. Integral means intrinsic, or in the words of the Department's regulations since the 1940s, so directly related to the worker's principal activities as to the integral. And indispensable involves looking at, well, could the worker dispense with this activity and continue to safely and effectively perform the productive work? The major lesson of BUST is that the reference point for both what is integral and what is indispensable is identifying the productive, is its relationship to the productive work. Your Honor, should we treat the donning and doffing of coveralls differently because there's a good reason to do that on-site rather than at home? The Department's longstanding position is that if the gear can, or any clothes, can be put on at home, we don't, we would say that was integral and indispensable. But you have to have a meaningful opportunity to do so. So I think you're looking, again, at the specific facts of the case. And in a situation where the employer has employees donning and doffing gear on the work site, I think you would look at that case and see why is that. Is it because of how important the gear is to the productive work? All right, there's some common sense to that, but it does seem like there might be perverse effects. You could have an employer get out of compensating employees by taking away the washing services here or something like that and saying, go do this at home. So are we at risk if we put too much weight on the at-home bit of discouraging these kind of conveniences of locker rooms and showers and things? That is why, and the Department of Labor, you know, we didn't actually raise the issue of that particular policy, although at some level it's been our longstanding policy. But I think the important thing, and this is, you know, the 10th Circuit's decision and Mounterra Farms is very helpful on this front. The important thing is it has to be a meaningful opportunity to, you know, take the gear home. So in the hypothetical you've described, I think you would need to look very closely about whether, you know, if you're taking gear home that's got hazardous material on it, you're contaminating perhaps your family's laundry. We haven't opined on that specifically, but I think a court or the department would want to look very carefully to see whether that was in fact meaningful. If it's okay, if I can keep going. Of course. What's the role of custom and industry practice here? I mean, we hear a lot in the briefs about what would disrupt the way things are going. Should we be reading the statute in light of custom? Did the regs look at what is customary in the various industries? I'm thinking of how to best answer that, Your Honor. Our regulations, there was very detailed legislative history accompanying the portal law. And you can tell in that legislative history that Congress was thinking very hard about the customs of the industries when they thought about how the Portal Act was to be interpreted. And our regs, which were passed very shortly after, also clearly were thinking about what was already happening in industry at the time. I don't think that we, in the test as BUSC has analyzed it, there's not sort of a get-out-of-jail-free card because of some sort of custom. But, of course, you would have to, again, look at all of the facts in the case and the totality of the circumstances when you're looking at whether you can dispense with the activities. Your regs do provide guidance on what is compensable and what is not. So what value should we give to those regulations in our decision? Our regulations are entitled to Skidmore deference here. These are longstanding regulations. And the court in BUSC was very clear that that task force was consistent with our regulations. So this court can use our regulations in BUSC, in Harmony, in providing guidance on how best for courts to apply this task force. I've got a series of hypothesis. Why don't you ask? Okay. All right. So I just. Of course. So what we're going to do, you have the same kind of rules is you're over time, so we're going to ask you to allow us to use this time to get answers to questions that we have. Okay? So my first is you talked about BUSC. And BUSC, the language in BUSC seems to cast out on whether an employee mandate can make something integral or indispensable or not. In your brief, however, you seem to talk about the PP in this instance was pursuant to an employee, employer mandate. What's left with reliance on employer mandates after BUSC? Or do we need to even consider that here where we have an OSHA regulation? Let me take those questions in turn, Your Honor. So the Supreme Court's decision in BUSC did not talk about whether, did not address the issue of how a rule of law might impact the indispensability analysis. And the Department has said since the 1940s that a rule of law can, requiring some type of changing of clothes to enable the worker to do the productive work can be indicative of the fact that that activity is integral and indispensable. And that, you know, that has not changed. Turning to the issue of employer requirements. The success of BUSC is that courts should not be taking these concepts, employer requirements, whether it primarily benefits the employer, in a vacuum. They have to be looking at those requirements in relationship to the productive work. So the fact that an employer requires something after BUSC does not make that thing indispensable to the work in the sense that, well, perhaps it is necessary because maybe the employee has to do it or they'll be fired. But it's not indispensable in the sense of this compensability analysis. The employer, when the employer requires something, however, in order to enable the worker to safely or effectively perform the productive work, that is very indicative of the fact that that particular thing is, in fact, indispensable to the productive work. BUSC doesn't lose that concept. BUSC says when you have a situation like the situation at issue there where you had post-shift security screenings were extremely removed from the productive work the workers were doing. They were putting, they were moving boxes around in an Amazon contractor warehouse. Their jobs had nothing to do with these security screenings. The fact that the mere, the mere fact, and that's the phrase that BUSC used, the mere fact the employer required them, that wasn't enough. But when you have an employer requiring something expressly to enable a worker to perform their job either safely or effectively, that is very significant still in the analysis. Okay, thanks. I have another question then we'll ask Judge Ambrose and then we'll turn it back over to Judge Bevis. The change at home rule, you were asked some questions about this and you, the question I have for you is does the change at home rule have to be mandatory or put differently? Does the employer's rule have to be you must change on the work site in order for it to be compensable? I don't believe the department has opined on that specific set of facts. You have, what we have said is when you, the employees are changing at home and they have a meaningful opportunity to do so, then the work, the activity is not integral or indispensable. So what do we do in a circumstance, and I know you're not opining on the facts of this case, so we'll pretend it's a hypothetical. Hypothetically, you have some people who changed in the work premises and others who changed off the work premises. Does that mean the change at home rule would require this to be a non-compensable act or is that an issue of fact that the jury would have to decide? I think there's still an issue of fact there about whether the opportunity to change at home was meaningful. What do you mean by meaningful? What would make it meaningful? Well, and the sort of leading case for this is the 10th Circuit's decision in Crasby Montere Farms, but to make sure that it wasn't illusory. We don't really know why are some people changing at home and are others changing at home, and is it in this case, and I, again, I'm sort of now posing a hypothetical, I suppose. Is it because it's possible to change at home when your home is a bunk station and has separate laundry facilities, but it's not actually possible to do so when you're taking your laundry home to your family? If, you know, that would be the type of thing you might, I think the Department would likely look at, and it seems like it would be prudent for a court to look at as well. Thank you. Okay. Okay. Let me give you a series of hypos and just give me brief answers to each one because there's a spectrum here, and we're trying to draw some lines on the spectrum. Waiter, waitress, busboy, there's a locker room at work, and the employer happens to launder the uniforms and provide them there. Integral and dispensable? It depends on the productive work and the necessity of the uniforms to that work. If you have a situation… A typical Greek diner. A typical Greek diner. Americana. You know, is that, are they wearing a uniform that makes them look as if they're from Greece and that is part of the customer's experience? That, to me, seems maybe the analysis goes one way. If their uniform is very similar to Shrikho's, perhaps the analysis goes the other way. You really have to look at why is the employer requiring this uniform. Okay. It has the person's name on it. It has a Greek flag motif. Like, you're saying that this all depends. You can't draw any lines here. Starbucks. Starbucks barista with an apron and a visor. You've been in a Starbucks. Does it depend? So, I think in most instances, the Starbucks barista is putting their uniform on before they come to work. I think that that would be an example that's much, much closer to the line of not integral and indispensable, and you might have some sort of de minimis question there as well. All right. It might be de minimis, but if it weren't de minimis, you're not comfortable saying it's not integral and dispensable, but you're not defending it. How about a judge's rope? Probably de minimis, but assume it's not de minimis. Well, that's an interesting question. Most likely, you're putting on your robe in the middle of your continuous work day for you, a non-exempt employee. So, it wouldn't be subject to this analysis at all because you're already doing work before, theoretically, before you come and sit down on the bench. But a judge's robe is an example. If you were to be donning your robe before you start your work day, that's an example where it might be more integral and indispensable to your job. It might be closer to something like the police officer's uniform in Perez, where it helps people to understand the scope of your authority. Wait a minute. How does that deal with safety and efficiency, putting on a robe? I think there's a key, perhaps, misconception in the way in the district court's decision. The line here, this idea that we sort of have these special rules for PPE, is sort of in tension with how the department has always looked at this. The department has always had regulations about clothing. And we said on the one hand, there's clothing that is merely convenient to changing of clothes. It's merely convenient to the employee. It's not directly related to the work. It might not have anything to do with risks at all. And then we said on the other hand, there's clothing that is integral and indispensable. But the clothing, it's clothing. It doesn't have to be PPE. And the fact that Congress promulgated 29 U.S.C. 2030 in the 1940s really reinforces that. Because they said that unions and employers could negotiate over the compensability of clothing. So it's sort of clothing, right, broadly. And you don't have to treat protective gear separately. I'm surprised you're not giving anything up. I mean, is putting on steel-toed boots, is there something that you can say isn't covered? Okay, let me give you a couple of examples of something that isn't covered. So very easiest example, after I'm preparing to leave the office today, I've done my work and I change out of my suit and I put on my exercise clothes and I leave. That is 100% not covered because it is entirely for my convenience. It has nothing to do with the work I'm doing. That's the very far end. Obviously the court is interested in somewhere where it's more in the middle. Here's another example. Let's say I'm preparing, I'm a paralegal in our office, I'm preparing records for a case. I like to wear those little rubber fingers so that I don't get a paper cut. That's probably not integral or indispensable. It's certainly related to the work that I'm doing, maybe it's integral. But it's not indispensable in the sense that if I take off those rubber fingers, even if I get a paper cut, no one would say in the ordinary sense of the word that I'm not sort of safely performing my duties. And that's probably why my employer isn't going to require me to wear those rubber fingers, and it's almost certainly the fact that OSHA is not going to require my employer to put those rubber fingers, have me wear those rubber fingers. All right. We appreciate your participation. Stay tuned. We have more advocates to hear from. We'll hear from counsel for precision. May it please the court. I'm Carter Crowe. I'm here for precision drilling. And I will start by addressing Judge Schwartz's question about integral and indispensable in this context. The context of this case is safety gear, okay? This is not a tools of the trade case, such as most of the meat processing cases that we've talked about. And in those meat processing cases, they talk about how the knives, the special aprons, et cetera, are integral to the performance of the work, and those are easier cases because you can't actually cut the meat without the knives, and the knives have to be sharp. And there's all those things associated with that. This is not a tools of the trade case. Well, let's talk about the aprons, though. At the end of the day, you've got chicken blood and chicken fat on you. Now, it wouldn't kill you to drive home with the chicken blood and chicken fat on you, but your wife would probably not be very happy with your coming home. Is it integral, indispensable to change in and out of the chicken blood and chicken fat at the poultry point? So, Your Honor, an issue with that is in those cases, typically those cases talking about the donning and the doffing are required to be done on the premises, even required by government regulation. And there's all kinds of food cleanliness regulations, et cetera, that apply to those circumstances, and the employers are not allowing that gear to be taken home in part. And oftentimes the cases don't explain and don't parse through exactly what those applicable government regulations that actually require the donning and doffing on premises in those cases. That is not at all the case that we've got here. The plaintiff's decided one OSHA regulation, which is a regulation dealing with safety generally, there's no question at all that that OSHA regulation requires the donning and doffing to be done on the employer's premises. In other words, it just says that the gear has to be worn. It doesn't say whether it can be changed into at home or not. But it would be indispensable, right? Because the OSHA requires you to wear it, so it's indispensable. Regardless of where you put it on. That definitely does relate to the indispensability argument, right? Our argument is mainly an integral argument. Our argument is mainly an integral argument, but you could say, well, can it be dispensed with? Or can the activity itself, in terms of going to these change houses, be dispensed with? Let's focus on some integral hypothesis here. Yes. I work as Goofy at Disney World, okay? Yes. So is it integral to change into the Goofy costume, or we're in Philly, okay, the Philly fanatic at the baseball games, right? Have you ever seen this costume? Yes. Big, fat guy with a big nose, like can't fit in the driver's seat of the car. So is it integral that the Philly fanatic change into that? There's actually a guy inside. Change into that costume at the stadium? I don't see why it would be. I think if I'm the employer there, I want him to be walking up to the stadium, right? Can't get in the car. Well, but he can take some other form of maybe he walks, maybe he takes the bus. Even if he's 5'4", like Dave Raymond, he can't get in the car. Yeah. So bring us back to these pure safety cases, like this case. Steiner is the Hallmark case. There the work environment was so permeated with toxic chemicals, right, that the changed clothing and the washing had to be done there, even by state regulation. It was required to be done on premises. The Supreme Court, this is very important in this case, because the department has indicated that the Second Circuit test, as articulated by the Second Circuit in the Perez case and the Gorman case, was properly articulated. Your position is that Steiner is basically the outer limit of what's covered here. And so even though your friend says, look, there are toxic chemicals on these overalls, you provide special washing machines. People are not supposed to be tracking the stuff into the trailers. But nevertheless, it's not – it doesn't really have to be done at work. That's your position. So, absolutely, that's our position. And that the change house is given for the convenience of these workers. There's no law or regulation requiring the activity to be done there. But it's very important, again, when you deal with the pure safety cases, to go back to Steiner and the statement by the court in Steiner saying that nor is the question of changing clothes and showering under normal conditions involved in this case because the government concedes that these activities ordinarily constitute preliminary or post-preliminary activities excluded from compensable work time under the Act. So are you saying that Steiner, in effect, sets the line or is merely an example that's far past the line of integral and dispensable? So in Steiner, the Supreme Court and the Department of Labor in that case took the position that the ordinary changing of clothes is not compensable under the Porter v. Porlock. So it's got to be a transcendent situation. That's where the language in Gorman and Perez come from. Why follow a transcendent when other circuits reject it? I don't think it has been rejected. The 11th circuit's not. So I think the department just said that in the pure safety context, again, it can't be an ordinary risk. So it's got to be a transcendent risk. And that is why that test has been stated. And then the gear has to be integral to dealing with that transcendent risk. Okay, let's say we disagree with the transcendent risk test, okay? And for the indispensable piece, we say it's a safety and effectiveness. Let's also say that we think the law or regulation point you're focusing on, that's pretty important for indispensable. But we're not going to say you need a law or regulation to make it integral, all right? I'm trying to figure out what makes something integral. And the statutory language is actually preliminary or post-liminary, right? Limit is a threshold. So something that has to happen between the threshold of walking into the workplace and the threshold of going out. So explain to me why the gear here isn't integral in the sense that it really ought to be done at the rig, given the contaminants and everything else. So integral in this context means that the gear is designed to deal with the specific threat that is at issue in the case. Okay, that sounds like it makes it pretty redundant of indispensable. Yeah. No. Indispensable is can it be dispensed with. Here, the examples that the courts use on integral are like sharpening the knives. Again, you can't cut the meat. You can't perform the work without it. And here. But here, the language in the Supreme Court cases talk about it not only just being safe but being efficient. The gear that the company must require these folks to wear, I don't think there's any dispute about that, to work on the rig, ensures that there aren't injuries on the workplace such that you can continue to have an efficient flow of your 24-hour-a-day operation. Am I correct? You don't want people getting hurt because if they get hurt, they're not working and it's highly inefficient. So that word efficient, as used in those cases, means you cannot perform the work without it, right? That's what your impression is of what efficient means? Yes. Yeah. The safe and efficient. Okay. So let's go with that. The knife is inefficient if it's not sharp. It's got to be sharp. Because you're not moving it along. That's right. A workplace is inefficient where people could get hurt and the rig's operation is interrupted because they're dealing with injured employees. I think, Your Honor, that you're confusing indispensable with integral. No, I was talking about efficiency, which is part of something being integral, right? Well, no. I think that in the context in which you're using it, you're saying that wearing the gear can't be dispensed with in terms of doing the job. But that doesn't make it integral to doing the job. Is integrity staffings talked about integral being closely linked with the productive work? Does that work for you? So, yes. So the example here is when the workers actually have to mix the chemicals, they have to put on special protective gear. There's a special respirator and a hood that is specifically designed to mix it, to protect them. That's happening during the course of the continuous day. Yes, that's happening during the – That's almost not what we're talking about here. We're talking about the boots, the glasses, the flame-retardant, fire-retardant coveralls. We're not talking about that PPE because it's happening during the work day. So you're struggling with the issue in the Gorman case, and that is how to make this generic work gear that's worn by like 12 million people across the United States every day. How to fit that into the test? How is that generic gear integral to the performance of this work? And that's our position that in the context of this case, it is not. Well, let's talk about someone who works at a nuclear power plant and has to wear a hazmat suit all day, okay? Homer Simpson could walk into that nuclear power plant and do the job without it. He might come home glowing or something. But is your position that it's not integral because he could, in theory, just come from home with the suit on? No. I would say that that gear is specialized gear designed to protect him against that specialized environment. And that is very close to that Steiner-type situation. That's the case that the plaintiffs tried to make in this case with the chemical exposure. I think the problem you have is if you're just saying it's like transcendent risk, that goes to indispensable. But now it sounds like you've got a jury question on your hands about we're just a few clicks along the spectrum from Steiner. No, there shouldn't be a jury question in most all of these circumstances because there should be no, you know, it doesn't seem like there's a dispute as to the facts about exactly the reason for wearing that hazmat suit in that case. It's a specialized suit, specially designed to deal with the specific environment. What's the definition of integral then? The definition of integral is essential to the completeness of the activity. It's got to be joined or linked. The cases talk about composed to constituent parts of the whole. Right, I know that's the definition in this report. Yeah, like powering up the legs. As a lawyer who has to advise clients, how do you put that into plain language in an opinion that we all could issue that says, in order for a task to be integral, it must be, I give it to you to tell me what it is. Yeah, so what I would say is I would follow the Ninth Circuit and say, we're not saying that this generic gear can never meet the test. We're saying that, hang on, she basically was complete the sentence, so just give me the words that would complete that sentence. Yes, the plaintiffs haven't proven that this gear is integral and indispensable, especially because, as the district court said. The sentence was focusing on, you want to try to. One more time, okay. Yes, I'm sorry. You're going to counsel your client. They're going to start this new business. Yes. And you have to tell them, listen, there's going to be compensation issues if you require certain clothing or the OSHA requirements require a certain guard to perform the task. It has to be integral. And what I mean by that is, fill in the blank. And don't tell me about, it can't be generic or specialized. Like, you wouldn't say that to your client. Like, what would you tell your client, what does integral mean? I would say it needs to be designed to and proven effective at preventing the very risks that are proven to exist in this situation. We've got a photo in the record of a hard hat with a bolt through it. How much more necessary is there than preventing someone from being brained? So, the way that Judge Brand dealt with that, I think it is appropriate. In terms of, it's got to be, it's got to, there's got to be some level of frequency in terms of tying the thing that the gear is intended to protect against to the principal activities. How do you reconcile that with Perez and the bulletproof vest? There was no statistics there of how many times officers, God forbid, are shot. That is true. And that is partly why Judge Brand said that this issue about frequency, and it can be addressed on a spectrum. He talks about it being addressed on a spectrum. Because it's clear that in Steiner, it was a constant, permeated situation. And in Perez, the issue there that the court said, and frankly the court remanded that case to the district court for further development of the facts on that issue. But the court said there was no dispute in Perez that that was a danger, that it was a specialized danger that applied just to the people in that job, and that that vest was especially designed to deal with that specific danger. So should we let a jury decide whether there's sufficient danger on the rig to determine whether this should be integral? No, and I don't see how they can in this case, because the issue is the plaintiffs are required to actually put in evidence at summary judgment to prove up what these risks are, and that this gear is designed to deal with those risks and is effective in terms of dealing with the risk. And that's what the court said they did not do, because they developed this case, as I said, as a chemical exposure case. They planned to prove it up through their expert. Their expert was stricken and left them in a situation where they just tried to throw the kitchen sink in of all these different things, but they just didn't have the proof to do it. But there were OSHA regs that require providing protection against chemical spills and burns and things like that, right? There are OSHA regs that require this stuff to be worn, not to be worn at the workplace, and those regs don't specifically link the need to wear this gear. This gear, again, being generic gear. You've said they don't require them to be changed into at the workplace, but you're saying the OSHA doesn't require them to be worn at the workplace? It requires them to be worn, but not donned and doffed at the workplace. I gathered that earlier, but they do have to be wearing it at the workplace. They do have to be wearing it at the workplace. Are you disputing that as to any of the items of clothing we're talking about here or protective gear? Yes. And don't let me forget on this point that the plaintiff's argument is not – I haven't heard them articulate at all that it can't be donned at home and worn to the workplace, because it is basically like ordinary clothes. These are coveralls. These are boots. Would your position be the same about a respirator, that the respirator could be worn from home? The respirator is not an issue in this case at all. But let's take some job where you wear a respirator all day. Would you say that could be worn from home? I think under the Department of Labor's test, if they allow somebody to take that respirator home and it can be taken home, there's no problem with it. Wow. There's not much of a limiting principle there. If there were no OSHA regs, what would you require? What would precision require for this job? If there were no OSHA regs, I don't know, Your Honor. I mean, that question has not been posed in that manner in this case. What would you take into account in making that determination? What would be taken into account in terms of that? The issue that would be taken into account is the particular activities done by the particular employees and what would be necessary for them to perform those employees safely. To what extent is safety taken into account? Safety is taken into account. There are general OSHA requirements that must be complied with. The general duty clause has to be complied with. All of those things must be met. But that does not make them integral and indispensable. Again, as the Court stated in Steiner, the ordinary change of clothes doesn't meet the test. Don't rig hands face significant safety risks over the course of their 12 hours? Just as virtually every blue-collar worker in every construction site, et cetera, across the country. Construction site workers face the potentiality of the fires that could happen on an oil rig? Yes, and blowouts. Yes, they do. And every worker in every petrochemical facility faces… I'm with you on petrochemical. We're kind of in the same ballpark. But when I heard you say construction, I'm thinking building a home, even building an office building in the middle of Philadelphia. The information provided by OSHA is over 12 million workers wear the same gear to work. Well, that goes back to generic. We're going to follow the same rule we had with the others. You're over time, but the panel might have other questions, so I want to ask my colleagues if there's anything further. Just one second, counsel. Yes. I'm just – are you suggesting that essentially these workers, all they need is just generic type of clothes and that's it? There's nothing special they need for this particular job? You're – I'm not doing that. I think in order to satisfy the general duty clause, even if you didn't have this particular regulation, they would probably have to wear that stuff. But our view is that that does not make it integral to the performance of this work. If you're advising precision, and precision from an economic point of view, they want to be sure that their people can continue to work as efficiently as possible. Getting hurt makes it inefficient. So what can – what would you do? What would you have them wear in order to give them the type of protection they need so that they will get hurt less often? Isn't that right? Your Honor, I'm not a safety expert. I don't see why they wouldn't have to wear this same gear. Again, that just makes this ordinary safety gear. It does not make it integral and indispensable. Again, you have to understand, this test is intended to be the exception to the rule, not the general rule. So a general rule as to what employees should wear is not effective here. What the Department of Labor's test is trying to do is just substitute this safe and effective use test for – and have it as a substitute for the integral and indispensable test. It's kind of like an integral or indispensable. Well, I mean, doesn't integrity staffing say a little bit differently than that? No. Integrity staffing makes it clear that you have to satisfy both integral and indispensable and that those are two separate and distinct. I get it. But integrity staffing, what does it say about indispensable? Can the employees reasonably dispense with the disputed activity and carry on their productive work safely? Isn't that what integrity staffing says? I think so. I think so. In that context, there's a lot of cases where it is indispensable, but it is not integral, right? Just because it's indispensable does not do it by itself. And that's, again, what the Department of Labor tests, I think. That's the flaw in that test. And the use of their test would open the floodgates just in the manner that the Anderson case did and just would cause the same troubles that the Portal to Portal Act was intended to prohibit. Run it by me one more time, if you can, in just a few words. What is wrong with the test suggested by the Department of Labor? It does not treat integral and indispensable as two separate and distinct inquiries that both must be satisfied, which is wrong. I looked at their brief, and their brief seems to separate it out. What am I missing? Is there something in there? They talk about integrity staffing. They talk about Steiner. They talk about Mitchell. And essentially, one of the latest things is integrity staffing from 2014. I don't see them really veering from that. And you're saying somehow they did. Well, I'm saying that they seem to be wanting to substitute this for the safe and effective performance of the work for going through separately, is it integral and is it indispensable, which is what the Supreme Court requires us to do. Just if you know, and I'm not sure how relevant it is, but if we think it's relevant to know something about the custom in the oil drilling industry, can you tell me anything about is it customary for people on rigs to be wearing roughly the same gear that these workers are wearing on precisions rigs? It is customary for them to wear this same standard PPE. It's customary to wear. Is it customary to don a doff at work? It is. The thing that is unusual about this case is the change house. Most of these drilling rig compounds don't have this separate change house area. The employees just take the stuff home. They normally take the stuff home. Yes. That is my understanding. But your understanding is that. Yes. Is there anything in the record that speaks to that, do you know? I don't know if there's anything, and I'm not aware of anything. I will say that the record shows, including the video evidence, these people arrive in various states of dress and undress, wearing parts of this stuff or not parts of it. Some fully geared up, some not. Some drive in. Some walk from their trailer. Some of them are coming in fully wearing the gear, and others are putting it on there. Yes. And some of them have got the fire retardant coveralls on, but they don't have their boots on. It's in various states, and they change in the parking lot, right? During the relevant period of this, that would cover this case, did Precision have a rule that required folks to change on the premises? No. During this relevant period, they did not? They did not. They did not. And this evidence that I just cited and we've got in the record shows that they did not, they at least did not uniformly all change on the premises. That part I know. I was really asking about the company policy. Yes. But let me speak to that point in terms of the plaintiff's argument. Their argument against the change-at-home rule is that, well, there's a regulation that says you shouldn't take it at home if it's dirty. That would mean that the regulation prevents doffing at the workplace but not donning at the workplace, right? So they would say that there's a different compensability paradigm that should be applied to the doffing but that wouldn't apply to the donning at all. Those two don't have to go hand in hand. I'll try one more time if I can to see if I can understand this. Is your argument that for donning and doffing purposes, we can disregard risks that are serious but not unique to drilling rigs? I'm saying that if you don't think about is the gear designed to deal with this risk, you're taking the integral part of the test out of the test. Is it yes or no and then you can explain? Yes. It needs to be a non-ordinary risk and the gear has got to be designed to deal with that risk. So you can disregard risks for donning and doffing purposes, you can disregard risks that are serious but not unique to drilling rigs? In this context, yes. So in effect, you're saying generic PPE is not compensable for donning and doffing purposes, only specialized PPP is, right? In the context of this case, that's exactly true. The issue there is in Steiner, the court talks about how well showering and changing clothes is nonspecific. It can be viewed generically because of the environment that is at issue there. Go ahead, why don't you finish it off. The courts that talk about that issue, including the Perez Court, they talk about it's got to be a fact-intensive inquiry and you have to look, as the department has said, you have to look at what are the principal activities and then is this gear designed to and effective in terms of dealing with those principal activities? And this generic gear, it might be able to reach the standard, but as the Second Circuit says in Gorman, it's a hard row to hoe. Okay, counsel, thank you for your arguments. Thank you, Your Honor. Thank you. I think I'd like to start a change-at-home rule because there's been a lot of questions. I think there's two important points the court consider because I don't believe a reasonable juror could find there was a reasonable opportunity to change at home. First is that this court's prior mandate, and I'm just using this as a shorthand, it stated it's undisputed in the course of the rigged hand's work, drilling oil and gas rigs, the basic PPE becomes covered with drilling mud, grease, lubricants, and caustic chemicals. The basic PPE reduces the risk of exposure to those substances. On page 22 of our reply brief, we quote Federal Regulation 40 CFR 43534, which states, there shall be no discharge of wastewater pollutants associated with drilling for unconventional oil and gas extractions, including but not limited to drilling muds, drill cuttings, produced sand, and produced water into publicly owned treatment works. We also cite to Pennsylvania State Law and various other states. Based on that alone, oh, it's also where we also have significant evidence to declarations the defendant themselves filed stating things like the PPE gets, quote, this is from a manager, Dale Quigley is actually a vice president, gets very dirty, and most employees do not want to soil the interior of their personal vehicles, homes, or hotel rooms with drilling mud. Do you think that there's an issue of fact on this? No, I don't believe a reasonable juror faced with the fact that it would be illegal under federal law to wash the PPE at home when it is undisputed the PPE becomes exposed with drilling muds and drilling fluids, as this court already found, was undisputed. Thus, a jury cannot find that that does not occur. You're answering the follow-up question only. You want a jury trial, right? No, I want this court to reverse the denial of our summary judgment and direct the court to enter judgment in our favor. It's a big ask. Well, we don't think the facts here are disputable. I understand that we did file for summary judgment. It's clear within this court's power to remand with instructions to enter judgment for us. We haven't asked you anything about de minimis. Well, that's true. Right? And even your adversary says the plaintiff can't get summary judgment because there are issues of fact by implication means there's issue of facts concerning de minimis. To the very least, there seems to be an issue of fact on de minimis. We don't have evidence as to the aggregate amount of time that would be required to demonstrate whether it is or is not de minimis. So, how do you rule in your favor on this record? Well, I suppose if the court remanded for de minimis, it would be a disappointing but acceptable result, and I'm obviously saying that somewhat humorously. But I would say this. There are three elements for the de minimis defense, and because it is an affirmative defense, it was the defendant's burden of summary judgment to demonstrate all three. They didn't even attempt to prove two of them, which is administrative feasibility and the aggregate. There's a recent Tenth Circuit case we cite to Peterson. In Peterson, they were dealing with two to three minutes per shift, which is what the defendant in that case said it would take. And the Tenth Circuit pointed out, well, if it takes two to three minutes per shift and that's all it takes, it's very administratively feasible to record that time. There is no reason they could not have added the Donning and Doffing time to the peg. There's no administrative infeasibility issue. It's not a sporadic thing that's done only on occasion. It's done every single shift. It has to be done every single shift. They haven't met that burden. And so even if the court found it took 60 seconds to put on the PPE, there's no administrative infeasibility. The only reason the defendant is here, you may say, well, that seems unfair. Well, they should have paid for that minute, and we think it takes more. And there's clearly a dispute as to how much time it takes, and that would have to be remanded. But that doesn't get them to minimis. I just would like to say one last thing, which is according to the employer's handbook, as long as I've continually heard this PPE was not designed, it specifically says the minimal, and this is on the Appendix 610, this is in their handbook, the minimal personal protective equipment is designed to protect you from hazards and some situations it can save your life. I think I've heard them say that's not what it's designed to do, and although it seems self-evident to me that it is, it's worth pointing out the record is awash with references similar to that. If there's no further questions, I thank the panel for their time. We thank all counsel for their arguments. We will ask that a transcript of the argument be prepared, and we'd ask the parties to share the expense of the transcript, and the Court will take the matter under advisement. Thank you for your excellent briefing and argument. Thank you. And thank you to the Department of Labor for joining us. Next time, come in person. Thank you, Your Honor. You're welcome.